**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PRO PUBLICA, INC. <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF VETERANS AFFAIRS <br><br> Defendant. | No. 1:16-cv-02462-RC |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Pro Publica, Inc. ("ProPublica" or "Plaintiff") and its reporter Charles Ornstein—a Pulitzer-prize winning news organization and a Pulitzer-prize winning journalist, respectively— have sought the disclosure of records from defendant United States Department of Veterans Affairs ("VA") since May 2016 concerning communications between VA and its consultant Alvin L. Young, Ph.D. ("Young") on issues related to the effects of Agent Orange and other herbicides used during the Vietnam War. The records, requested under the Freedom of Information Act ("FOIA"), relate to communications involving Young and various leaders and office holders at the VA, as well as communications relating to any contracts awarded to Young. One of those office holders is David J. Shulkin, MD, the current Under Secretary for Health at the VA who was recently nominated (on January 11, 2017) by President Trump to be the next Secretary of Veterans Affairs.

The disputed FOIA request has been pending for 248 days. Originally submitted to the Veterans Health Administration ("VHA") and granted "expedited processing," the request was referred in part to the Veterans Benefits Administration ("VBA") and the Office of the Secretary of Veterans Affairs ("OSVA") for response concerning requested communications involving

certain individuals.  VHA has done anything but the "expedited processing" that it granted.  Not a single document has been produced by VHA.  VBA never acted on ProPublica's request for expedited treatment, and also has produced nothing.  Only OSVA provided a response determination (producing nothing).

ProPublica has an urgent need for the requested records.  VHA recognized this (while VBA completely ignored it).  ProPublica's attempts to have VA actually process the FOIA request simply have fallen on deaf ears.  Even with a bullhorn in hand, thus far, ProPublica seemingly could do no more than shout into the wind while VA's inaction persists.

The FOIA statute requires that "each agency, upon any request for records . . . shall make the records *promptly* available to any person."  *See* 5 U.S.C. § 552(a)(3)(A).  And a "person primarily engaged in disseminating information," i.e. a member of the press, is entitled to request and receive special, expedited treatment for a FOIA request when there is "urgency to inform the public concerning actual or alleged Federal Government activity."  *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).  Yet here, neither "prompt" nor "expedited" processing of Plaintiff's FOIA request has occurred and the specter of potential bad faith unavoidably looms over this matter.

As set forth herein, ProPublica has numerous reasons for urgent disclosure of the records.  With President Trump having taken office on January 20, 2017, the administration will once again begin considering new rules concerning benefits, such as disability compensation, for individuals with ailments or disabilities linked to exposure to Agent Orange.  Not surprisingly, the VA put all such efforts on "hold" several months ago, given the expected reassessment of priorities by a new administration.  Moreover, Dr. Shulkin's unknown views concerning Agent Orange have gained added significance since his confirmation hearing on February 1, 2017 during which he was silent about Agent Orange, a subject of importance to millions of veterans.

## STATEMENT OF FACTS

ProPublica's FOIA request at issue in this case was submitted to VHA's FOIA Office on May 31, 2016 ("FOIA Request"). *See* Ornstein Decl. Exhibit 1. The FOIA request sought disclosure of correspondence between January 1, 2012 and present between Young and fourteen current or former VA officials. *See* Ornstein Decl. at ¶ 9. In addition, the FOIA Request sought correspondence, including internal approval justifications, with respect to any contracts awarded to Young or his consulting firm A. L. Young Consulting, Inc., since January 1, 2010. *Id.* VHA's FOIA Office assigned the FOIA Request tracking number 16-08181-F and retained responsibility for responding with respect to six of the fourteen individuals whose correspondence was being sought (including, *inter alia*, Dr. Shulkin). *Id.* VHA referred the FOIA Request to VBA for response concerning five of the individuals and assigned the request tracking number 16-08183-F. Finally, VHA referred the FOIA Request to OSVA for response concerning three individuals and assigned it yet another tracking number, 16-08182-F. *Id.*

In the ***eight months*** since submission, despite repeated communications between ProPublica and VA evidencing the untimely processing of the request,[1] not a single page has been produced to date. *See* Ornstein Decl. at ¶¶ 10, 11. Neither VHA nor VBA has provided *any* response determination. *Id.* Only OSVA provided a response determination.[2] VHA granted (but did not satisfy) ProPublica's request for expedited processing of the FOIA Request, while VBA failed to act on that request at all. *Id.* at ¶ 12.

_____

[1] There have been communications on: May 31, 2016; June 2, 2016; Aug. 4, 2016 (four times); Aug. 5, 2016; Aug. 7, 2016; Sept. 15, 2016 (twice); Sept. 16, 2016 (twice); Sept. 30, 2016; Oct. 11, 2016; Oct. 12, 2016; Oct. 17, 2016; Oct. 20, 2016 (three times); Oct. 25, 2016 (three times); Nov. 8, 2016; Dec. 5, 2016; and Dec. 9, 2016 (twice). *See* Ornstein Decl. Exhibits 1-5 & 7-8.

[2] OSVA alleged, in a July 15, 2016 letter, that it "conduct[ed] a diligent search of archived emails and OSVA's correspondence database" but concluded that it had no responsive records to disclose. *See* Ornstein Decl. Exhibit 6.

Lack of Assistance from Senior Leadership at VA

Frustrated with VHA's and VBA's inaction, ProPublica sought the assistance of Kai Miller, Chief of Staff of VA's Office of Information and Technology ("OI&T"). But repeated communications between ProPublica and Ms. Miller—between September 16 and December 9, 2016—never actually led to any substantive discussion between them about the problems encountered with OI&T concerning the FOIA Request. *See* Ornstein Decl. Exhibits 7-8.

VHA's and VBA's Shifting Excuses for Their Delay

VHA's and VBA's purported reasons for their failure to timely process the FOIA Request have shifted over time, in a nuanced fashion, leading to VA's most recent revelation of an alleged "large, VA system-wide data migration error":

- at 10:39 a.m. on August 4, 2016, VBA stated that "[b]ased upon extensive searching, reviewing, redacting and copying there may be a delay ranging from 90 to 120 days" (Ornstein Decl. Exhibit 3);

- at 10:53 a.m. on August 4, 2016, VBA stated that based upon "notification from our IT Office . . . they are estimating that it will take up to 18 months to retrieve the data you requested" (Ornstein Decl. Exhibit 3);

- on August 7, 2016, VBA stated that "[t]he data [ProPublica is] requesting requires that VBA OI&T recreate email accounts beginning January 2012 until present day for several VBA current and former employees," "a need to search for, collect, and review a voluminous amount of records," and "a need to consult with two or more components within the [VA]" (Ornstein Decl. Exhibit 3);

- on September 15, 2016, VHA stated that "[t]he search . . . has been delayed due to the inability of the VA's [OI&T] department to search and retrieve any emails responsive to your request from the archive email server," "the search must be conducted on a storage device that has experience[d] several system failures," "OI&T is working to have the data on the storage device migrated to another server," and "[i]t is estimated at this time that it will take anywhere from 2-4

months for the data migration to be completed and allow for the record search to begin" (Ornstein Decl. Exhibit 5);

- on October 12, 2016, VHA stated that it continued to "wait[] for assistance from another program office to get the emails currently available uploaded to the Clearwell system" (Ornstein Decl. Exhibit 5);

- on October 20, 2016, VBA stated that there was "a need to search for, collect, and review a voluminous amount of records" and "a need to consult with two or more components within the [VA]" (Ornstein Decl. Exhibit 4);

- on October 25, 2016, VHA stated that it still needed "assistance of OGC and IT to upload the emails from the server into the Clearwell system" and that it "continue[d] to pursue their assistance but to no avail yet" (Ornstein Decl. Exhibit 5);

- on January 19, 2017, counsel on behalf of VA stated that "[d]ue to a large, VA system-wide data migration error that occurred several months ago, a large portion of the Department's electronic files . . . are currently completely inaccessible" and "it may take as long as 60 days for the Department's Information Technology (IT) department to resolve these problems" (Ornstein Decl. Exhibit 9).

Defendant now represents that two different VA administrations—VHA and VBA—and indeed much of the Department itself, remain unable to access "a large portion" of VA's electronic files.[3]  There has been no disclosure of exactly when this alleged computer failure occurred, or the timeframe of records that have been impacted.  While counsel for VA recently indicated that a "large . . . error" occurred "several months ago" necessitating "60 days . . . to resolve these problems," it has now been six months since VBA indicated it needed "up to 18 months to retrieve the data."  *See* Ornstein Decl. Exhibits 3 & 9.  This information seemingly

---

[3] Based on VA's shifting explanations about its processing delays, ProPublica is now concerned that at least some of the records sought in the FOIA Request may have been irretrievably lost, or worse, that spoliation has occurred.  The facts surrounding the records' unavailability will need to be fully vetted before this concern can be allayed.  VA of course has well known obligations to preserve its records, especially emanating from the Federal Records Act, 44 U.S.C. chapters 21, 29, 31, and 33.

cannot be reconciled.  Furthermore, to ProPublica's knowledge, there has been no disclosure of this major IT failure to the public at large.

<u>Alleged Inaccessibility of Records for Current VHA and VBA Officials</u>

Of the eleven individuals whose communications involving Young, ***from January 1, 2012 to present***, remain to be disclosed in connection with the FOIA Request,[4] at least seven are still working with VA based on searches of publicly available information:

**<u>VBA Officials</u>**

- Thomas Murphy, ***current*** Acting Under Secretary for Benefits (Principal Deputy Under Secretary for Benefits);

- James Sampsel, ***current*** subject matter expert on Agent Orange;

- Brad Flohr, ***current*** Senior Advisor;

- Allison Hickey, ***former*** Under Secretary for Benefits;

- Janice Jacobs, ***former*** Deputy Under Secretary for Disability Assistance;

**<u>VHA Officials</u>**

- Dr. David J. Shulkin, ***current*** Under Secretary of Health;

- Dr. Ralph ("Loren") Erickson, ***current*** Chief Consultant, Post-Deployment Health Services;

- Dr. Lisa Thomas, ***currently*** at VA's National Cemetery Admin. and ***former*** VHA Assistant Deputy Under Secretary for Health for Workforce Services and VHA Chief of Staff;

- Dr. Carolyn Clancy, ***currently*** Deputy Under Secretary for Health for Organizational Excellence and ***former*** Interim Under Secretary for Health;

- Dr. Terry Walters, ***former*** Deputy Chief Consultant, Post-Deployment Health Services;

- Dr. Robert Petzel, ***former*** Under Secretary of Health.

---

[4] OSVA already provided a response determination on July 15, 2016 (and apparently had no responsive records) concerning the communications ProPublica sought involving former Secretaries of Veterans Affairs Eric Shinseki (who, on information and belief, served at VA *circa* Jan. 21, 2009 to May 30, 2014) and Robert McDonald (who, on information and belief, served at VA *circa* July 30, 2014 to Jan. 20, 2017) as well as former Senior Advisor to the Secretary, John Spinelli (who, on information and belief, served at VA *circa* Jan. 21, 2009 to 2014).  *See* Ornstein Decl. Exhibit 6.

There has been no explanation for the inordinate delay in searching records of **current** officials. How do those individuals conduct VA business without access to their email and electronic files?

Of particular interest are the communications involving Dr. Shulkin.  As the current Under Secretary for Health, he is the "Chief Executive of [VHA]."  *See* http://www1.va.gov/directory/guide/manager.asp?pnum=30282.  Announced by President Trump on January 11, 2017 as his nominee to be the next Secretary of Veterans Affairs, *see* https://greatagain.gov/shulkin-302876b6595a#.d8h1z1g6y, Dr. Shulkin would be the first non-veteran to lead the VA. *See*  https://www.propublica.org/article/the-chosen-who-trump-is-putting-in-power.  It seems improbable, indefensible, and illogical that Dr. Shulkin's email and electronic files could be inaccessible for any extended period of time *to him*, yet he must manage the VA.

<u>Inaction Concerning Request Related to Young's Consulting Contracts with VA</u>

The FOIA Request also specifically seeks "correspondence, including the internal approval justifications, for any contracts awarded to Dr. Young or his consulting firm, A. L. Young Consulting, Inc., . . . since Jan. 1, 2010."  *See* Ornstein Decl. Exhibit 1.  This request was not limited to any particular individuals at VA (such as those listed above).  While VHA apparently retained responsibility for searching for responsive records for this portion of the FOIA Request, VHA has never indicated why it could not conduct this search to date.  VHA has alleged a failure with respect to an "archive email server" and VA's counsel separately stated that there was "a large, VA system-wide data migration error."  *See* Ornstein Decl. Exhibits 5 & 9.  But is VHA truly incapable of accessing its records concerning contracts that it has awarded?

<u>Status of Processing the FOIA Request</u>

In sum, since May 31, 2016, the VA has failed to produce *any* records in response to the FOIA Request, with each of VHA and VBA not even providing a response determination stating

that it gathered and reviewed responsive documents, explaining the scope of the documents it intends to produce and withhold, or informing ProPublica of its right to appeal. *See* Ornstein Decl. at ¶ 11. Responses are woefully overdue from both VHA and VBA.

The FOIA Request simply has not been "promptly" processed, let alone processed in an "expedited" manner. *See, e.g.,* Ornstein Decl. at ¶ 55.

## ARGUMENT

There are two issues raised in this motion. **First**, VA's processing of ProPublica's FOIA Request has been subject to unreasonable delay, having been neither "prompt" nor "expedited." At this point, processing of the FOIA Request is a matter of urgency for ProPublica and the VA should be ordered to quickly act. **Second**, because of VA's failure to exercise due diligence with respect to processing ProPublica's FOIA Request, VA should be enjoined from using a temporal limitation for its searches for responsive records, i.e. a "cut-off date," that is any earlier than the date of the Complaint in this action. ProPublica's proposed cut-off date is reasonable under these circumstances of inaction by the VA.

### A. Legal Standards

"This court may issue a preliminary injunction only when the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that it would suffer irreparable injury if the injunction is not granted; (3) that an injunction would not substantially injure other interested parties; and (4) that the public interest would be furthered by the injunction." *Elec. Privacy Info. Ctr. v. Dep't of Justice ("EPIC I")*, 416 F. Supp. 2d 30, 35-6 (D.D.C. 2006). "Regardless of whether [a] sliding scale framework applies" in balancing the relative strength of showings for the factors, "it remains clear that a movant must demonstrate irreparable harm, which has 'always' been '[t]he basis of injunctive relief in the federal courts.'" *Newark Pre-School*

*Council, Inc. v. Dep't of Health & Human Svcs.*, No. 1:16-cv-01024 (APM), 2016 U.S. Dist. LEXIS 110442, at *11 (D.D.C. Aug. 19, 2016) (citations omitted).  "[I]njunctions issued by federal courts should be narrowly tailored to remedy the harm shown."  *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

Pursuant to the FOIA statute, "each agency, upon any request for records . . . shall make the records *promptly* available to any person."  5 U.S.C. § 552(a)(3)(A) (emphasis added). "Consistent with this statutory mandate, federal courts have jurisdiction to order the production of records that an agency improperly withholds."  *Nat'l Whistleblower Center v. Dep't of Health and Human Svcs.*, 849 F.Supp.2d 13, 25 (D.D.C. 2012) (citations omitted).  "Although [an] agency may desire to keep FOIA requests bottled up in limbo for months or years on end, the statute simply does not countenance such a system."  *Citizens for Responsibility & Ethics in Wash. ("CREW") v. FEC*, 711 F.3d 180, 186-87 (D.C. Cir. 2013).  "'[U]nreasonable delays in disclosing non-exempt documents violate the intent and purpose of the FOIA, and the courts have a duty to prevent these abuses.'"  *Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 494 (D.C. Cir. 1988), quoting *Long v. IRS*, 693 F.2d 907, 910 (9th Cir. 1982).  Moreover, "[t]he FOIA imposes no limits on courts' equitable powers in enforcing its terms."  *Id.* at 494 (citation omitted).  Thus, "[c]ourts have the authority to impose concrete deadlines on agencies that delay the processing of [FOIA] requests meriting expedition . . . and support the contention that courts have the authority, and perhaps the obligation, to scrutinize closely agency delay."  *EPIC I*, 416 F. Supp. 2d at 38 (citations omitted).

"FOIA requires that the agency make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years."  *CREW*, 711 F.3d at 188.  "[I]n order to make a 'determination' . . . the agency

must at least: (i) gather and review the documents; (ii) determine and communicate the scope of the documents it intends to produce and withhold, and the reasons for withholding any documents; and (iii) inform the requester that it can appeal whatever portion of the 'determination' is adverse." *Id.*

The FOIA statute gives the Court broad powers and forces a defendant agency to justify its conduct:

> [T]he district court . . . has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant. In such a case the court shall determine the matter *de novo*, . . . and the burden is on the agency to sustain its action.

*See* 5 U.S.C. § 552(a)(4)(B) (emphasis added).

When a plaintiff is "primarily engaged in disseminating information" and there exists an "urgency to inform the public concerning actual or alleged Federal Government activity," expedited processing is appropriate. *See* 5 U.S.C. § 552(a)(6)(E)(i) & (v)(II); 38 C.F.R. § 1.556(d)(1)(ii); *see also Leadership Conf. on Civil Rights v. Gonzales*, 404 F. Supp. 2d 246 (D.D.C. 2005); *Washington Post v. Dep't of Homeland Security*, 459 F. Supp. 2d 61 (D.D.C. 2006) (granting the newspaper's motion for a preliminary injunction ordering expedited processing), *vacated on consent motion as moot*, No. 06-5337, 2007 U.S. App. LEXIS 6682 (D.C. Cir. Feb. 27, 2007) (unpub.). Moreover, expedited processing is warranted when "[t]he failure to obtain the requested records on an expedited basis could reasonably be expected to pose an imminent threat to the life or physical safety of an individual" or when "[t]here is widespread and exceptional interest in which possible questions exist about the government's integrity which affect public confidence." *See* 38 C.F.R. § 1.556(d)(1)(i) & (iv). "Agency action to deny or affirm denial of a request for expedited processing . . . and failure by an agency to

respond in a timely manner to such a request shall be subject to judicial review." *See* 5 U.S.C. § 552(a)(6)(E)(iii).

As for the date range to be searched for responsive records, "a temporal limit pertaining to FOIA searches . . . is only valid when the limitation is consistent with the agency's duty to take reasonable steps to ferret out requested documents." *McGehee v. CIA*, 697 F.2d 1095, 1101 (D.C. Cir. 1983), *vacated in part in other respects*, 711 F.2d 1076 (D.C. Cir. 1983) (per curiam); *concur Public Citizen v. Dep't of State*, 276 F.3d 635, 644 (D.C. Cir. 2002), *aff'd in relevant part and rev'd on other grounds*, 276 F.3d 634 (D.C. Cir. 2002) (the proposition that a "time-of-request cut-off date" is always reasonable has been "expressly rejected"). The burden of establishing the reasonableness of temporal limitations on a search lies with the agency. *McGehee*, 697 F.2d at 1101.

When there has been a lengthy passage of time between the date the FOIA request was submitted to the agency and the date when the agency finally issues a response "determination," and ultimately produces documents, the propriety of a "time-of-request cut-off date" is viewed with great skepticism. *Id.* at 1103-04. Ordinarily a "determination"—including, *inter alia*, gathering and reviewing the requested documents—must be completed by the agency within 20 working days. 5 U.S.C. § 552(a)(6)(A)(i). "Unusual circumstances" allow that completion date to slip by 10 extra working days. 5 U.S.C. § 552(a)(6)(B)(i). Finally, only if an "agency is exercising due diligence in responding to the request" may a court find that "exceptional circumstances exist" warranting that the agency be permitted "additional time to complete its review of the records." 5 U.S.C. § 552(a)(6)(C)(i). The FOIA statute expressly states that "'exceptional circumstances' does not include a delay that results from a predictable agency

workload of requests . . . unless the agency demonstrates reasonable progress in reducing its backlog of pending requests." 5 U.S.C. § 552(a)(6)(C)(ii).

**B.      Plaintiff Is Entitled to a Preliminary Injunction**

VA's failure to process Plaintiff news organization's FOIA Request—which has been pending for 248 days—is unlawful.  All four prongs of the preliminary injunction standard are clearly met and preliminary injunctive relief should be granted.

**1.      Plaintiff Is Likely to Prevail on the Merits.**

**a)      VA has not "promptly" processed the FOIA Request.**

It would be objectively unreasonable for VA to contend that the endless delay it has effected with respect to processing the FOIA Request satisfies the FOIA statute's mandate that it "shall make [requested] records *promptly* available to [Plaintiff]."  *See* 5 U.S.C. § 552(a)(3)(A) (emphasis added).  This <u>is not</u> a case in which a plaintiff seeks relief because of an agency merely "blowing the 20-day deadline" to make its response "determination."  *See Elec. Privacy Info. Ctr. v. Dep't of Justice [EPIC II]*, 15 F. Supp. 3d 32, 41 (D.D.C. 2014).  This **<u>is</u>** a case in which the 20 working day deadline has passed ***eight times over*** (over eight months) for the FOIA Request.  No interpretation of the term "promptly" in the FOIA statute could encompass such a lengthy period of time without providing a response "determination" under *CREW* and making tangible progress in completing the processing of the FOIA Request by reviewing and producing responsive, non-exempt records.  The VA simply cannot "process the request at its leisure, free from any timelines." *CREW*, 711 F.3d at 186.

Both VHA and VBA have utterly violated the timeliness requirement of Section 552(a)(3)(A).  *See* Ornstein Decl. at ¶ 11.  Neither VHA nor VBA has provided a response "determination" satisfying the *CREW* standard nor produced a single page over the course of eight months and despite the exchange of at least twenty-six emails with ProPublica which has

repeatedly sought prompt processing.  *See* n. 1, *supra*; Ornstein Decl. at ¶ 13.  VHA and VBA simply have failed to fulfil their statutory obligations under FOIA and have both failed to exercise required diligence with respect to the FOIA Request.

The ordinary processing time limit of 20 working days, and a 10 working days' extension for "unusual circumstances," passed long ago for the FOIA Request.  At this point, VA could perpetuate its delays in handling this request *only* if it can demonstrate *both* that (1) the Department has exercised "due diligence" and (2) "exceptional circumstances" exist.  5 U.S.C. § 552(a)(6)(C)(i) & (ii).  VA cannot do so.

First, it is clear that due diligence has been completely lacking.  In eight months, VHA and VBA have not provided *any* response determination and neither VHA nor VBA has produced *any* record in response to the FOIA Request.

Second, VA cannot demonstrate that it has made "reasonable progress in reducing its backlog of pending requests," as the FOIA statute requires for the "exceptional circumstances" delay tactic to be approved.  *See* 5 U.S.C. § 552(a)(6)(C)(ii).  As can be seen from Table I below, the FOIA statistics from VA's various quarterly reports appear to be extremely unreliable.  *See* Ornstein Decl. at ¶ 70-76.  The VA has neither explained the discrepancies between the data nor explained why either VBA or VHA would have experienced a massive change in its backlog for consecutive FY16 quarters, Q3 and Q4.  *Id.* at ¶ 74.  The only conclusion that might be drawn from the data is that VHA's FOIA backlog continues to *grow*.  *Id.* at ¶ 73.  Nevertheless, ***three different versions of VA's FY16Q4 FOIA report*** indicate widely varying backlogs for VHA, VBA, and VA as a whole.  There have been swings of plus or minus 1,000 to 2,000 backlogged requests for VA department-wide, and for VHA and VBA individually, as indicated in the reported data below:

**Table I**

| Department / Component | Requests Backlogged as of End of Reporting Quarter | | | | | | |
|---|---|---|---|---|---|---|---|
| | FY15Q4 (Exh. 29) | FY16Q1 (Exh. 30) | FY16Q2 (Exh. 31) | FY16Q3 (Exh. 32) | FY16Q4 (Exh. 34) | FY16Q4 (Exh. 37) | FY16Q4 (Exh. 38) |
| VA dep't-wide | 954 | 1117 | 1270 | 2032 | 3296 | 4296 | 1108 |
| VHA | 329 | 325 | 334 | 349 | 363 | 3582 | 394 |
| VBA | 379 | 560 | 683 | 1418 | 2582 | 363 | 363 |

*See* Ornstein Decl. at ¶¶ 61-76; Exhibits 29-39.[5]

At this time, it is unclear whether VA's delays in handling the FOIA Request are due to chronic understaffing of its FOIA operations, failures to allocate appropriate financial resources

---

[5] There are manifest irregularities in VA's reporting of its backlogs of FOIA requests, at the least with respect to FY16Q4, that render the reliability of VA's statistics highly dubious. "[A]ll agencies are now required [by the Department of Justice] to post four key FOIA statistics each quarter of the fiscal year which are then also displayed on FOIA.gov." *See* https://www. justice.gov/oip/blog/agency-quarterly-foia-reporting. This quarterly reporting is meant "to increase accountability and enhance public awareness of agencies' efforts in administering the FOIA." *See* https://www.justice.gov/oip/blog/foia-guidance-8. As one of the metrics, "requests [are] reported as 'backlogged' . . . if they are pending beyond the statutory time period for response, . . . or if unusual circumstances are invoked." *Id.* Despite the reporting requirement, VA's FY16Q4 quarterly report (for the fiscal year quarter ending September 30, 2016) was conspicuously unavailable from VA's web page where those reports are accessed, http://www.oprm.va.gov/foia/foia_reports.aspx. *See* Ornstein Decl. at ¶¶ 66, 70, 75 & Exhibits 33, 36 & 75. However, because VA's quarterly data is made available on two websites—va.gov and FOIA.gov—ProPublica still was able to obtain VA's backlog data for FY16Q4 from the latter. *See* Ornstein Decl. at ¶ 67 & Exhibit 34. But VA disavowed the accuracy of the backlog information posted on FOIA.gov and subsequently provided two different versions of its FY16Q4 FOIA backlog report. *See* Ornstein Decl. at ¶¶ 70, 71 & Exhibits 36, 37. None of the three sets of backlog data for FY16Q4 are consistent for VHA, VBA, or VA department-wide. *See* Table I, *infra*; Ornstein Decl. Exhibits 34, 37 & 38.

Because of the clear inconsistencies in VA's reported data, and the lack of prompt disclosure of the various versions of the FY16Q4 report on VA's web site, there are serious questions concerning the integrity of VA's FOIA quarterly backlog data. *See* Ornstein Decl. at ¶ 76. The discrepancies with respect to FY16Q4 call into question the reliability of VA's data for other fiscal year quarters as well. *Id.* ProPublica is left wondering whether VA's FOIA quarterly backlog data has been compromised. *Id.*

Narrowly-tailored discovery requests to VA concerning these discrepancies might ferret out explanations for why there have been swings in the reported backlogs at VHA, VBA, and VA department-wide. Because the FOIA statute specifically relies on agencies' backlog metrics in determining whether there are "exceptional circumstances" under which delays in processing FOIA requests are excused, the accuracy of VA's backlog metrics is important. *See* 5 U.S.C. § 552(a)(6)(C)(ii).

to those operations, data migration issues, computer equipment failures, intentional efforts to frustrate ProPublica's reporting concerning Agent Orange, or otherwise.  Regardless, VA cannot prove both "due diligence" in processing the FOIA Request and "exceptional circumstances" so as to justify continued delays.

In summary, ProPublica is likely to prevail on the merits in demonstrating that VA has not made its responsive, non-exempt records "promptly available" to ProPublica.

> **b)  VHA granted expedited processing for the FOIA Request, but eight months of inaction cannot be considered expeditious.**

There is no dispute that on June 2, 2016—eight months ago—VHA <u>granted</u> expedited processing with respect to the FOIA Request.  *See* Ornstein Decl. Exhibit 2 ("[p]lease be advised that I am granting your request for expedited processing").  There also is no dispute that VHA has not rendered a response determination or produced a single page since the FOIA Request was submitted.  *See* Ornstein Decl. at ¶ 11.  "As time is necessarily of the essence in cases like this, such harm [in acting expeditiously] will likely be irreparable."  *EPIC I*, 416 F. Supp. 2d at 40-1.

In circumstances analogous to these, this Court previously granted preliminary injunctive relief after finding the irreparable injury requirement to be met:

> [Plaintiff's] right to expedition is certainly not satisfied by [the agency's] decision to give priority to [Plaintiff's] requests.  What matters to [Plaintiff] is not how the requests are labeled by the agency, but rather when the documents are actually released.  As [Plaintiff] contends, "merely paying lip service" to [Plaintiff's] statutory right does not negate "the harm that results from the agency's failure ***to actually expedite*** its processing."  Unless the request[] [is] processed without delay, [Plaintiff's] right to expedition will be lost.

*Id.* at 41 (internal citation omitted) (emphasis added).  Indeed, VHA's own decision to grant expedited processing essentially forecloses any argument that irreparable injury would not occur:

> [An agency's] arguments challenging the irreparable nature of the harm sustained by [Plaintiff] as a result of [the agency's] delay is severely undermined by its determination that [Plaintiff's] FOIA request[] merit[s] expedition.  Such a determination necessarily required [the agency] to find that there was an "urgency to inform the public" . . .  Given this concession, the court finds it hard to accept [an agency's] argument that disclosure is not urgent and that further delay will not harm [Plaintiff].

*Id.*  Moreover, "[b]eyond losing its right to expedited processing, [Plaintiff] will also be precluded, absent a preliminary injunction, from obtaining in a timely fashion information vital to the current and ongoing debate surrounding" the influence of Young on issues related to the effects of Agent Orange and other herbicides used during the Vietnam War.  *Id.*

### c)  VBA has not acted on Plaintiff's request for expedited processing of the FOIA Request.

As a separate matter, ProPublica requested expedited processing of the FOIA Request. *See* 5 U.S.C. § 552(a)(6)(E)(i) & (v)(II) as well as 38 C.F.R. § 1.556(d)(1)(ii).[6]  *See* Ornstein Decl. Exhibit 1.  VBA never acted on that request.  *See* Ornstein Decl. at ¶ 12.

It is beyond debate that ProPublica is a "person primarily engaged in disseminating information" within the meaning of 5 U.S.C. § 552(a)(6)(E)(v)(II) and 38 C.F.R. § 1.556(d)(1)(ii).  ProPublica is an independent newsroom that produces investigative journalism in the public interest.  *See* Ornstein Decl. at ¶ 8.  Honored with three Pulitzer Prizes, ProPublica's news coverage currently attracts 1.1 million unique visitors per month to its web site.  *Id.*  ProPublica's "publishing partners," who publish articles written by ProPublica's journalists and sometimes in collaboration with their own reporters, have included more than 135

---

[6] Because VBA, to date, has not communicated any determination concerning ProPublica's request for expedited processing, the Court is free to consider extra-record evidence and argument concerning the appropriateness of granting expedited processing.  This is not a situation in which "judicial review shall be based on the record before the agency *at the time of the determination*," given that there has been no determination by VBA.  *See* 5 U.S.C. § 552(a)(6)(E)(iii) (emphasis added).

news organizations, many of which are household names.[7] *Id.* ProPublica's reporting on Agent Orange—with The Virginian-Pilot—won the 2016 "Topical Reporting" award from the Online News Association, the world's largest organization of digital journalists. *Id.* at ¶ 46.

ProPublica has demonstrated a "compelling need" justifying expedited processing. The FOIA Request explicitly states:

> [ProPublica] would like to request expedited consideration for this request as it relates to a matter of urgency. The Institute of Medicine recently released its 2014 Agent Orange update related to possible presumptive conditions connected to herbicide exposure. Dr. Young has been an active advisor to the VA on matters relating to herbicide exposure.

*See* Ornstein Decl. Exhibit 1. ProPublica therefore clearly conveyed sufficient rationale to the VA to conclude that there is a compelling need for expedited processing of the subject request based on urgency for the new media to inform the public concerning actual or alleged Federal Government activity. *See* 5 U.S.C. § 552(a)(6)(E)(i) & (v)(II); 38 C.F.R. § 1.556(d)(1)(ii).

And as of January 11, 2017, there is yet another compelling need for the requested records: President Trump's nomination of David J. Shulkin, MD, who is the current Under Secretary for Health at the VA, to be the next Secretary of Veterans Affairs. *See* Ornstein Decl. at ¶ 50. The FOIA Request explicitly seeks records involving Dr. Shulkin. *Id.* at Exhibit 1. As Secretary, Dr. Shulkin would *de facto* lead the VA's ongoing response with respect to veterans exposed to Agent Orange, including with respect to VA's commitment to conduct relevant research, provide compensation and other benefits, engage the Vietnam veterans' community in

---

[7] *See, e.g.*, Charles Ornstein [*ProPublica*], *A Patient Is Sued, and His Mental Health Diagnosis Becomes Public*, THE NEW YORK TIMES (Dec. 23, 2015); Charles Ornstein [*ProPublica*], *Your Health Records Are Supposed to be Private. They Aren't*, THE WASHINGTON POST (Dec. 30, 2015); Charles Ornstein, [*ProPublica*], *New England Journal of Medicine Increasingly Targeted by Critics*, THE BOSTON GLOBE (Apr. 5, 2016); Charles Ornstein & Jessica Huseman [*ProPublica*], *Nursing Home Residents Being Exploited Online — Legally*, THE DES MOINES REGISTER (July 14, 2016).

open and frank discourse, and adjust its policies as appropriate.  *Id.* at ¶ 50.  It also needs

scarcely to be mentioned that if he is confirmed, Dr. Shulkin will be the first non-veteran to be

Secretary of Veterans Affairs.  *Id.*

In view of the foregoing, there is an urgent and current debate concerning whether the

Senate should confirm Dr. Shulkin's nomination and also how best to work with Dr. Shulkin

based on his personal views.  *Id.*

Further need for expedited disclosure is explained by Wesley T. Carter—a disabled

veteran who is terminally ill from the cancer and heart disease presumptively associated with his

exposure to Agent Orange during his military service.  *See* Declaration of Wesley T. Carter,

Major, United States Air Force (Ret.) ("Carter Decl.") at ¶¶ 3-4.  Carter states:

> Based upon my interactions with the Vietnam veterans'
> community and veterans service organizations ("VSO") serving
> these individuals, as well as my interactions with veterans who had
> post-war contact with C-123 aircraft contaminated with Agent
> Orange, many such veterans and their offspring have been disabled
> and/or are in poor health, and they suspect Agent Orange and
> dioxin are to blame.  I believe that there is growing evidence
> linking Agent Orange to poor health outcomes in those
> populations.  In addition, my terminal illness is due to presumptive
> diseases associated with exposure to Agent Orange  As the VA
> considers benefits, and healthcare, for its aging group of Vietnam
> veterans (and possibly their offspring), it is critical that there is
> transparency with respect to VA's interactions with Dr. Young.  I
> understand, for example, that Dr. Young advised VA in a May 15,
> 2013 email that "our troops were never at a significant risk for
> exposure to Agent Orange." . . . If this email is indicative of the
> kind of advice that VA is taking seriously, then I personally have
> major concerns about the VA's approach to understanding and
> addressing Agent Orange exposures.  I believe that the public
> needs to be fully apprised of Dr. Young's impact on VA policy,
> planning, funding, and initiatives concerning Agent Orange.

*See* Carter Decl. at ¶ 12 & Exhibit 5 (internal citation omitted).

There also are good reasons to grant expedited processing pursuant to 38 C.F.R. §

1.556(d)(1)(i) & (iv).  "The failure to obtain the requested records on an expedited basis could

reasonably be expected to pose an imminent threat to the life or physical safety of an individual." *See* 38 C.F.R. § 1.556(d)(1)(i).  Vietnam-era veterans are now reaching advanced age after the passage of four decades since the war.  *See* Ornstein Decl. at ¶ 48.  Some have contacted ProPublica and stated that they are dying; their health problems may well be due to Agent Orange.  *Id.*  Wesley Carter is one such individual.  *See* Carter Decl. at ¶¶ 3-4.

Because of his exposure to Agent Orange and his work as Chairman of the C-123 Veterans Association, Carter is among those in the public who are especially interested in the disclosure of the records requested in ProPublica's FOIA Request on an expedited basis.  *Id.* at ¶¶ 5-6 & 11-13.  With respect to whether failure to obtain the records requested by ProPublica, on an expedited basis, could reasonably be expected to pose an imminent threat to the life or physical safety of an individual, Carter states, in part:

> Many of us are dying—I am terminally ill—or in extremely poor health, quite possibly as a result of our exposure to Agent Orange and dioxin.  I understand that Dr. Young has played a pivotal role in shaping positions taken by the United States government, including the military and the VA, with respect to Agent Orange and dioxin.  Yet his opinions on this subject have been questioned, and in some instances soundly rejected, by those outside the government circle in which he has been compensated to consult.  Prompt disclosure of his interactions with VA will allow the interested public, including those of us who are dying or in ill health, to better understand how the VA has been impacted by Dr. Young's opinions and, for example, whether health care for veterans has been adversely impacted by those opinions.  If so, we may be able to promptly respond to Dr. Young's opinions in a manner that positively impacts our health outcomes.

*Id.* at ¶ 11.  Carter's mention of Young's influence stems in part from documents he obtained showing that Young advocated destruction of certain physical evidence related to Agent Orange, which the government carried out.  *See* Carter Decl. at ¶ 7 & Carter Exhibits 1, 2.  His mention of Young's questionable opinions stems in part from a consulting report that Young wrote for VA in which Young concluded that certain Agent Orange exposures would have been

"negligible," a conclusion that subsequently was rejected by the Institute of Medicine ("IOM"). *See* Carter Decl. at ¶¶ 8-10 & Carter Exhibits 3, 4.

As a separate consideration weighing in favor of expedited processing, "[t]here is widespread and exceptional interest in which possible questions exist about the government's integrity which affect public confidence." *See* 38 C.F.R. § 1.556(d)(1)(iv). For example, Young advised the VA (during the timeframe of the communications requested in the FOIA Request) that "[h]istorical records and environmental fate studies support the conclusion that our troops were never at a significant risk for exposure to Agent Orange." *See* https://www.propublica.org/documents/item/3145886-May-15-2013-email.html (email obtained through a FOIA request unrelated to the present dispute). ProPublica recently reported that "more than anyone else, [Young] has guided the stance of the military and U.S. Department of Veterans Affairs on Agent Orange and whether it has harmed service members." *See* Ornstein Decl. Exhibit 10.

But Young has his critics. "'Most of the stuff [Young] talks about is in no way accurate,' said Linda S. Birnbaum, director of the National Institute of Environmental Health Sciences, part of the National Institutes of Health, and a prominent expert on dioxin. 'He's been paid a hell of a lot of money by the VA over the years, and I think they don't want to admit that maybe he [isn't] the end all and be all.'" *Id.*; *see also* Ornstein Decl. Exhibit 11 ("Eight Times Agent Orange's Biggest Defender Has Been Wrong or Misleading"). "Over the years, the VA has repeatedly cited Young's work to deny disability compensation to vets, saving the government millions of dollars." *Id.* All the while, Young has profited handsomely from the Agent Orange controversy. "In recent years, Young, 74, has been a consultant for the Department of Defense and the VA, as well as an expert witness for the U.S. Department of Justice on matters related to dioxin exposure. By his own estimate, he's been paid 'a few million' dollars over that time." *Id.*

In 2012, the VA awarded Young "a $600,000 no-bid contract to write research reports on Agent Orange." *Id.*

In 2015, a committee of the IOM charged with evaluating certain potential exposures to Agent Orange "noted that those from in the military or associated with the VA tended to minimize the possibility of an increased risk of exposure and adverse health outcomes." *See* Ornstein Decl. at ¶ 48 & Exhibit 28.  Importantly, they noted "emphatically" that prior exposure models were incorrect in view of what "is now accepted in the field of exposure science." *Id.* Young's exposure models appear to be squarely in the IOM committee's cross-hairs. *Id.*

Carter also raises red flags about Young's apparent influence:

> There is great concern among veterans, including myself, regarding Dr. Young's influence on the VA.  This is particularly the case with respect to VA's views on links (or alleged lack thereof) between Agent Orange and various disabilities and diseases of veterans who were exposed to it as well as those veterans' offspring.  Without full and prompt disclosure, it is impossible for the interested public to sufficiently address, and if necessary respond to, Dr. Young's views conveyed to the VA.  I am aware that VA is now considering revisions to the benefits received by veterans exposed to Agent Orange, as well as evaluating research priorities.  For example, the VA is in the process of considering whether to add bladder cancer as a presumptive disease associated with exposure to Agent Orange.  In this time of potential change, there is a loss of public confidence (including mine) in the VA as we learn more about Dr. Young's extensive dealings with this important part of our federal government, to which we have not had adequate opportunity to respond and shape VA's views.

*See* Carter Decl. at ¶ 13.

In sum, ProPublica is likely to prevail on the merits in demonstrating that VBA has failed to respond in a timely manner to ProPublica's request for expedited processing of the FOIA Request and that ProPublica has demonstrated entitlement to such treatment.

**d)     Because of VA's inaction as well as the scope of the FOIA Request, early "cut-off" dates for VA's searches would be unreasonable.**

Turning next to the date range that VA must search for responsive records, it would be unlawful and unreasonable for VA to use a "cut-off date" prior to the filing of the Complaint in this action.  Reporting on the news demands timeliness and completeness of information.  *See* Ornstein Decl. at ¶ 60.  For that reason, the FOIA Request specifically seeks responsive records from January 1, 2012 "to present" or "since" January 1, 2010.  *See* Ornstein Decl. Exhibit 1.  The scope of the FOIA Request thus explicitly anticipated the possibility that VA might not act with dispatch in processing the request.

"[T]he most appropriate cut-off date for [a] search would be the date of [VA's] *final decision* . . . Surely, at that point, Plaintiff[] [is] put on notice that the VA [is] no longer searching for records.  Additionally, . . . such a cut-off date in the absence of a published cut-off date 'is consistent with the agency's duty to take reasonable steps to ferret out requested documents.'"  *Dayton Newspaper, Inc. v. VA*, 510 F. Supp. 2d 441, 450-51 (S.D. Ohio 2007).  As *CREW* makes clear, the date of a final "determination" is *not* necessarily the date of actual production of responsive, non-exempt records.  711 F.3d at 188.  There has not been any such final "determination" by VHA or VBA in connection with the FOIA Request.

Additionally, "[l]imiting a search by applying a cut-off date, without providing notice of the date to the requester, renders the search unreasonable."  *Dayton Newspaper*, 510 F. Supp. 2d at 449; *see also McGehee*, 697 F.2d at 1105.  Without "determinations" from VA concerning the FOIA Request, there has been no notice of a cut-off date.

Moreover, as demonstrated by VA's lack of progress in processing the FOIA Request, and VA's statistics concerning its backlog of FOIA requests during the last five quarters for which those statistics are available, *see* Table I, *supra*, VA is not "an agency that responds to

requests on a relatively current basis." *McGehee*, 697 F.2d at 1104.  To the extent VA has conducted any searches thus far, they are now outdated.  It has been impossible for ProPublica to determine when the FOIA Request has "near[ed] the head of the 'queue'" for processing by VA. *Id.*  It also is clear, given the lack of response determinations and document productions by VA, that this is <u>not</u> a case in which "[s]ubstantive review follow[ed] promptly" after VA's searches to date and "all nonexempt material [was] released" shortly thereafter.  *Id.*

It would be unreasonable, burdensome, inefficient, and generally counterproductive to force news organizations like ProPublica to repeatedly file the same FOIA request with a non-responsive agency, like VA, so as to keep resetting the clock for the timeframe of potentially responsive documents to be searched in the agency's records.  That is especially true here, where VA has failed to actively process the FOIA Request at issue.  VHA also redirected the FOIA Request to several components—VBA and OSVA—and it would be unfair and illogical to place the burden on ProPublica to subsequently file repetitive FOIA requests with each unresponsive component.  Imposing such a requirement would unnecessarily multiply the number of requests pending before VA, further taxing VA's FOIA offices by swelling VA's FOIA request docket along with its associated record-keeping, searching, and reporting obligations.

In the present circumstances, "one can easily imagine . . . a cut-off date ***much later than*** the time of the original request, that results in a much fuller search and disclosure . . . , [and] that forecloses the necessity for an excessive number of supplementary demands" through the refiling of the same FOIA request.  *Id.* (emphasis added).  "Because the Department has a large 'backlog' of FOIA requests, and because [Plaintiff has] no way of knowing whether the Department created new responsive documents after the date of [Plaintiff's] request" (but suspects so), the Court must reject a cut-off date when its "net result is to increase processing

time by forcing [Plaintiff] to file multiple FOIA requests to obtain documents that the Department would have released in response to [the] single request had it used a later cut-off date." *Public Citizen*, 276 F.3d at 643 (internal citation omitted).

ProPublica is likely to prevail on the merits in demonstrating that VA's own dilatory conduct—vastly exceeding the statutorily prescribed time frames for handling the FOIA Request—justifies a cut-off date for responsive, non-exempt records closely aligned with the date on which VA (and its components) actually provides response determinations and document productions in response to that request.

### 2. Plaintiff Will Suffer Irreparable Injury Without the Requested Injunctive Relief.

ProPublica will suffer irreparable injury in the absence of the requested preliminary injunctive relief.  Quite simply, there are "time-sensitive public interests which underlay the request" that ProPublica made pursuant to FOIA and that is the subject of this motion. *Washington Post*, 459 F. Supp. 2d at 75.  In such circumstances, "stale information is of little value."  *Payne Enterprises, Inc.*, 837 F.2d at 494.

First, without immediate disclosure of the records requested in the FOIA Request, ProPublica will suffer irreparable injury with respect to its ability to timely and thoroughly report, for the public benefit, on the urgent and current issues surrounding the nominee for the next Secretary of Veterans Affairs, Dr. Shulkin, including his views concerning Agent Orange. *See* Ornstein Decl. at ¶ 51.  "Because the urgency with which the" Plaintiff presses the FOIA Request in part "is predicated on a matter of current national debate," due to the confirmation hearing on February 1, 2017 and potential confirmation of a new Secretary to lead VA, "a likelihood for irreparable harm exists if the plaintiff's FOIA request does not receive expedited treatment."  *Washington Post*, 459 F. Supp. 2d at 74-5.  Here, "the specter of information

becoming stale and of little value, increases" with respect to Dr. Shulkin as VA's stonewalling is preventing thorough consideration of the views of the nominee prior to confirmation. *Id.* at 74. Even if confirmation occurs, an immediate understanding of Dr. Shulkin's views vis-à-vis Agent Orange is important if the public is to impact the priorities he sets for the department during his first days in office. *See* Ornstein Decl. at ¶ 51.

ProPublica requires immediate disclosure of the requested records involving Dr. Shulkin in order to inform the public about his communications involving Young, if any, which to some extent are shrouded in mystery. *Id.* During his confirmation hearing on February 1, 2017 before the Senate Veterans' Affairs Committee, Dr. Shulkin did not even mention the words "Agent Orange." *Id.* Yet according to the VA, "[b]etween January 1965 and April 1970, an estimated 2.6 million military personnel who served in Vietnam were potentially exposed to sprayed Agent Orange." *See, e.g.,* http://www1.va.gov/opa/pressrel/pressrelease.cfm?id=1796. The public interest in timely and thorough reporting concerning Dr. Shulkin dictates immediate disclosure of the records requested in the FOIA Request. *Id.*

Second, with President Trump having just taken office on January 20, 2017, and a new Secretary of Veterans Affairs nominated (on January 11, 2017) to head VA, there is an urgent and current debate concerning an array of decisions to be made by the incoming administration regarding Agent Orange. *See* Ornstein Decl. at ¶ 47, Exhibit 27. Those decisions for example include: (1) whether veterans' exposure to Agent Orange can affect their descendents and whether those descendents should receive benefits; (2) whether to expand the list of diseases that are presumed to be linked to Agent Orange; (3) whether to make naval veterans who served off the coast of Vietnam eligible for benefits; and (4) whether to extend coverage to service members who served along the Korean demilitarized zone during the Vietnam War and who say

they were exposed, as well.  *Id.*  Without immediate disclosure of the records requested in the FOIA Request, ProPublica will suffer irreparable injury with respect to its ability to timely and thoroughly report, for the public benefit, on these urgent and current issues concerning the effects of Agent Orange and other herbicides used during the Vietnam War and Young's subsequent influence on U.S. decision-making about veterans exposed to them.  *See* Ornstein Decl. at ¶ 47.  ProPublica requires immediate disclosure of the requested records in order to inform the public about VA's views and priorities on this subject, which to some extent are shrouded in mystery.  *Id.*

Third, ProPublica will suffer irreparable injury without immediate disclosure of the records requested in the FOIA Request because the Vietnam-era veterans whom they seek to research, interview, and/or report about are reaching advanced ages and some are dying, possibly due to Agent Orange.  *Id.* at ¶¶ 48, 49.  If there is information contained in responsive records that might at least give clues about how to recognize and/or treat maladies caused by Agent Orange and dioxin, yet those records are not being timely disclosed, ProPublica will not be able to convey the information for the betterment of the interested public or report with the benefit of insights from these dying veterans.  *Id.*

Fourth, in March 2016, the Institute of Medicine ("IOM") released its Tenth Biennial Update of the *Veterans and Agent Orange* (*VAO*) series, with particular attention to scientific studies published from September 30, 2012 through September 30, 2014, concerning Agent Orange and dioxin.  *See* Ornstein Decl. at ¶ 52.  That report provides a basis on which the Secretary of Veterans Affairs can decide to expand benefits, including compensation, for veterans with certain illnesses scientifically linked to Agent Orange.  *See id.* at ¶ 52, Exhibit 20.

It has now been over ten months since that report was released, yet the VA has not publicly provided any reaction to the findings therein.  *Id.* at ¶ 52.

It is clear, based on a statement ProPublica obtained from the VA on November 4, 2016, that for several months now the VA has deferred action on finalizing its responses with respect to the IOM's ten-month old report, pending the new administration assuming control.  *Id.* at ¶¶ 53, 54.  The VA also has not actively pursued amendments to its regulations, in light of the IOM report, to expand the list of "presumptive diseases" associated with exposure to Agent Orange, which could trigger benefits for additional veterans and their survivors.  *Id.*  Given that a new administration just took office on January 20, 2017, this period of inaction is about to end.  *Id.* at ¶ 54.

There is an urgent and current debate concerning how the next administration should respond to the IOM's March 2016 report on Agent Orange.  *Id.*  Without immediate disclosure of the records requested in the FOIA Request, ProPublica will suffer irreparable injury with respect to its ability to timely and thoroughly report, for the public benefit, on these urgent and current issues.  *Id.*  ProPublica requires immediate disclosure of the requested records concerning Young's influence on VA with respect to issues about the effects of Agent Orange and other herbicides used during the Vietnam War.  *Id.*  Without that disclosure, ProPublica cannot adequately inform the public about the VA's views on presumptive diseases and whether new ones should be imminently recognized through rulemaking.  *Id.*  At least to some extent, these views are presently shrouded in mystery.  *Id.*  The public interest in timely and thorough reporting concerning potential new "presumptive diseases" dictates immediate disclosure of the records requested in the FOIA Request.  *Id.*  There is urgency to inform the public concerning actual or alleged Federal government activity with respect to the IOM report.  *Id.*

"[T]he most compelling reason to grant injunctive relief is to prevent the judicial process from being rendered futile by a party's act or refusal to act." *Armstrong v. Bush*, 807 F. Supp. 816, 821 (D.D.C. 1992).  Without immediate disclosure of the requested records, the judicial process will fail to prevent the loss of timely reporting on issues of vital interest.  "Not only is public awareness a necessity, but so too is *timely* public awareness." *EPIC I*, 416 F. Supp. 2d at 40 (emphasis in original).  In addition, to state the obvious, "[w]ithout a preliminary injunction directing the [government] to process the plaintiff's FOIA request in an expedited fashion, the plaintiff would lose out on its statutory right to expedited processing." *Washington Post*, 459 F. Supp. 2d at 75.

Finally, since 2015, ProPublica together with The Virginian-Pilot have engaged in a project known as "Reliving Agent Orange," during which reporters from these news publications, in part, have been investigating ways in which children of Vietnam veterans may be affected by a parent's exposure to Agent Orange.  *See* Ornstein Decl. at ¶ 23.  To help ProPublica investigate the impact of Agent Orange, ProPublica and The Virginian-Pilot together have undertaken numerous unique and dedicated efforts including: conducting surveys of veterans of the Vietnam War, their children, and their family members concerning how they believe Agent Orange exposure has impacted their health or family's health (as of mid-December 2016, these surveys had generated over 6,000 responses); hosting discussions on the multigenerational impacts of Agent Orange, including a panel discussion on June 30, 2016 in Washington, DC; conducting a crowdsourced effort to gather information on more than 700 Navy ships that either saw combat in Vietnam or whose activities may have exposed the ship to Agent Orange; and conducting a scientific study approved by an Institutional Review Board ("IRB") provided by a private company—so as to gain access to a VA registry of health data on

more than 600,000 veterans—after the VA refused to disclose its data in response to a FOIA request (which is not at issue in this case). *Id.* at ¶ 24.

ProPublica has dedicated significant resources and extensive investigative reporting to Agent Orange and specifically the influence of VA's consultant, Young, on issues related to the effects of Agent Orange and other herbicides used during the Vietnam War. *Id.* at ¶ 25. Numerous articles have been published, many of which have been republished in *Stars and Stripes*. *Id.* at ¶¶ 26-44 & 47, Exhibits 10-27. ProPublica continues to invest significant resources and extensive investigative reporting with respect to researching and reporting on Agent Orange and specifically the influence of VA's consultant Young on issues related to the effects of Agent Orange and other herbicides used during the Vietnam War. *Id.* at ¶ 45. ProPublica also continues to have intense interest in educating the public, including its readers in Congress, the administration, the military, and the veteran community concerning this subject matter. *Id.* And ProPublica continues to see intense interest in this subject matter from its readership as well as those who have completed its surveys or provided information through its crowdsourced efforts. *Id.*

ProPublica's considerable investments in labor, capital, and time in connection with its reporting on Young's influence on the federal government, including VA, will be irreparably injured without the requested injunctive relief. *Id.* at ¶ 59. Without immediate disclosure of the VA's records as sought by ProPublica, its reporting on this subject matter of considerable public interest is frustrated and opportunities to exploit ProPublica's investments in this area are forever lost. *Id.*

To summarize, disclosure of the records sought in the FOIA Request would serve the public interest and inform the public debate about the influence of VA's consultant, Young, on

issues related to the effects of Agent Orange and other herbicides used during the Vietnam War, which is of vital and urgent public concern.  *Id.* at ¶ 56.  Any further delay in the processing of the FOIA Request, and application of any improper cut-off date for searches, will irreparably harm ProPublica's ability, and that of the public, to obtain in a timely fashion information vital to the current and ongoing debate surrounding whether to amend VA's regulations, or institute rulemaking in connection with new VA regulations, regarding Agent Orange and other herbicides used during the Vietnam War.  *Id.* at ¶ 57.  There is a compelling need for the FOIA Request to be immediately processed, and responsive records to be immediately produced, given the urgency to inform the public concerning actual or alleged Federal government activity related to Young's influence on VA.  *Id.* at ¶ 58.  Without prompt access to information about Young's interactions with VA, as requested in the FOIA Request, ProPublica's ability to engage in an urgent and current debate, through its reporting on this subject matter, will be irretrievably lost.  *Id.* at ¶ 60.

### 3.     Injunctive Relief Will Not Burden Others' Interests

VA "cannot be said to 'be burdened by a requirement that it comply with the law.'" *EPIC I*, 416 F. Supp. 2d at 41 (citation omitted).  The preliminary injunctive relief that ProPublica seeks requires nothing more of the government than prompt and/or expedited processing of the FOIA Request as well as searches that apply reasonable cut-off dates.  All are legally required.

Still further, Congress already balanced the competing interests of various FOIA requesters in providing a statutory right to expedited processing, for example, for members of the press.  *See* 5 U.S.C. § 552(a)(6)(E)(v)(II).  That some FOIA requesters are entitled to move through the processing queue faster than others has already been contemplated and approved.

Finally, VA's workload will not be materially altered by the grant of injunctive relief; the scope of its document review and production remains unchanged whether the FOIA Request is processed immediately or at a later date.

### 4.       The Public Interest Favors the Requested Relief

"The public interest prong is met because 'there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.'  Moreover, the public interest is also served by the expedited release of the requested documents because it furthers FOIA's core purpose of 'shedding light on an agency's performance of its statutory duties.'"  *EPIC I*, 416 F. Supp. 2d at 42 (citations omitted).

In view of the urgent and current debate surrounding, *inter alia*, the influence of Young, the nomination of the next Secretary of Veterans Affairs, the impending priority-setting by a new administration, the deleterious effects of Agent Orange and dioxin being experienced on a daily basis by countless veterans (and their offspring), and the effects of their poor health on their families, the public interest favors a preliminary injunction requiring the VA to promptly and/or expeditiously meet its obligations under the FOIA statute and *CREW*, applying a reasonable cut-off date to searches, and disclose all responsive, non-exempt records forthwith.

### CONCLUSION

The VA has neither satisfied the time constraints applicable to FOIA requests nor acted with any semblance of due diligence.  Exceptional circumstances cannot be demonstrated to excuse any further delay.  It is clear that ProPublica is likely to succeed on the merits and irreparable harm will occur without timely and complete response "determinations" in connection with the FOIA Request as well as release of responsive, non-exempt records. Finally, a preliminary injunction would further the public interest while not burdening others' interests.

The public cannot be timely informed about "what their government is up to" if the VA is permitted to continue its seemingly endless cycle of delaying action on the FOIA Request. *See United States Department of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 772-73 (1989). When, as here, such a core purpose of FOIA is so thoroughly thwarted, preliminary injunctive relief is entirely appropriate.

For the foregoing reasons, ProPublica's motion for a preliminary injunction should be granted. A proposed order is submitted herewith requiring VA to provide the following to ProPublica with respect to the FOIA Request: (1) partial response "determinations," complying with *CREW* and with cut-off dates no earlier than the date the Complaint was filed in this action, for records to and from David J. Shulkin, MD, no later than seven days following grant of injunctive relief as well as production of responsive, non-exempt records along with a *Vaughn* index of any withholdings by ten days following grant; and (2) complete response "determinations," complying with *CREW* and with cut-off dates no earlier than the date the Complaint was filed in this action, no later than twenty-one days following grant of injunctive relief as well as production of responsive, non-exempt records along with a *Vaughn* index of any withholdings by thirty days following grant.

Pursuant to LCvR 65.1(d), ProPublica requests a hearing on this motion at the earliest juncture.

Dated: February 2, 2017      Respectfully submitted,

/s/ Seth A. Watkins
Seth A. Watkins (D.C. Bar # 467470)
    Email: watkins@adduci.com
ADDUCI, MASTRIANI & SCHAUMBERG LLP
1133 Connecticut Avenue, NW
Washington, DC 20036
Telephone: (202) 407-8647
Facsimile: (202) 466-2006

*Attorneys for Plaintiff Pro Publica, Inc.*